# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**

* * * * * * * * * * * * * * * * * * * * * *
ISABEL ZAMORA, * No. 21-1414V
*
Petitioner, *
* Special Master Christian J. Moran
v. *
* Filed: September 22, 2026
SECRETARY OF HEALTH *
AND HUMAN SERVICES, *
*
Respondent. *
* * * * * * * * * * * * * * * * * * * * * *

Courtney Jorgenson, Siri & Glimstad, LLP, Phoenix, AZ, for petitioner;
Andrew Downing, formerly at Downing, Allison & Jorgenson, formerly counsel of record for petitioner;
Naseem Kourosh, United States Dep't of Justice, for respondent.

**DECISION AWARDING ATTORNEYS' FEES AND COSTS**[1]

Isabel Zamora alleged that an influenza ("flu") vaccine caused her to develop chronic fatigue syndrome. She did not receive compensation and then disputed the denial of compensation through a motion for review. The Court denied the motion for review.

Ms. Zamora now seeks an award of attorneys' fees and costs. The Secretary argues that the motion for review was not well grounded.

Ms. Zamora has not shown that the motion for review presented arguments on which she was likely to succeed. Thus, this portion of Ms. Zamora's request for attorneys' fees is denied.

---

[1] Because this decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. Any changes will appear in the document posted on the website.

However, other aspects of the case were reasonably litigated. For those portions, Ms. Zamora is awarded a total of $84,566.97 in attorneys' fees and costs.

## I. Facts[2]

### A. Before Vaccination

Ms. Zamora was born in 1962 in Mexico. Exhibit 10 (affidavit regarding damages) ¶ 1. She averred that before the allegedly causal vaccination, she had "very controlled pre-diabetes." Id. ¶ 3; Exhibit 48 (affidavit) ¶ 4. However, via her attorney, she also represented that she was not receiving much medical treatment. Pet'r's Status Rep., filed Oct. 17, 2022.

In the years leading up to the allegedly causal vaccination, Ms. Zamora earned income, which was reported to the Social Security Administration. Exhibit 56. Ms. Zamora's primary job was working on an assembly-line. Exhibit 10 ¶ 5.[3] Although Ms. Zamora earned some wages, she remained eligible for Medicaid, which largely paid her medical expenses. Id. ¶ 4.

On at least two occasions before the allegedly causal vaccination, Ms. Zamora received other doses of the flu vaccine. See Exhibit 4 at 82 (Jan. 26, 2018) and Id. at 63-64 (Oct. 12, 2017). In November 2018, Ms. Zamora went to Mexico for plastic surgery. Exhibit 4 at 94.

### B. Vaccination and Afterwards

On October 8, 2019, Ms. Zamora went to the place where she received her primary medical care, Salud Para La Gente, where she saw a nurse practitioner, RoseMarie Sandoval. Ms. Zamora received a dose of the flu vaccine. Exhibit 4 at 99. The specific type of flu vaccine was Flulaval. Id. at 28. Flulaval contains an inactivated form of the flu virus. Court Exhibit 1001 (Flulaval package insert) at 5.

Through an affidavit created during this litigation, Ms. Zamora averred that soon after the vaccination, she began to experience headaches. Exhibit 1 ¶ 1. Ms. Zamora further avers that she also developed fatigue. Id.

Within approximately two weeks of the vaccination, Ms. Zamora sought care at Salud Para La Gente for a lacerated finger. Exhibit 4 at 102 (Oct. 11, 2019 – initial visit) and at 104 (Oct. 18, 2019 – suture removal). Although a complaint about fatigue was not memorialized in the records created on these two dates, Ms. Zamora averred that she was experiencing fatigue, weakness, or confusion. Exhibit 14 ¶ 10. Likewise, Ms. Zamora attested that when she had a routine screening for breast cancer on October 31, 2019, she was feeling exhausted. Id. ¶ 11.

Ms. Zamora averred that when she woke up on November 4, 2019, "everything was different. The headache was very intense in the back, but [she] had the sensation of being in

---

[2] The recitation of facts is taken from the Entitlement Decision, 2025 WL 1105282.

[3] In her affidavit, Ms. Zamora estimated her annual earnings were in an amount that exceeded the earnings reported to the Social Security Administration.

another dimension as if it were disconnected." Exhibit 1 ¶ 2. Ms. Zamora also asserted that she was "dizzy, confused and scared because [she] did not understand what was happening." Id.

Ms. Zamora averred that during a trip to Mexico from November 16, 2019 to December 9, 2019 to visit her mother, she felt "very sad" because she didn't know what was going on with her health. Exhibit 14 ¶ 18. In December 2019, Ms. Zamora scheduled an appointment with her doctor for January 2020. Exhibit 1 ¶ 3.

This appointment at Salud Para La Gente took place on January 2, 2020, when nurse practitioner Sandoval saw her. Exhibit 4 at 113. Ms. Zamora's chief complaint included "headache, dizziness, and blurry vision on and off x 1 month." Id. NP Sandoval assessed Ms. Zamora as suffering from adjustment disorder with anxiety. Id. at 114-15. NP Sandoval recommended that Ms. Zamora seek therapy. Id.

By February 2020, Ms. Zamora was working. Exhibit 1 (affidavit) ¶ 3; see also Exhibit 56 (Social Security Administration records). Ms. Zamora averred that working was difficult because she had no control over her headaches and fatigue. Exhibit 1 ¶ 3. In February 2020, Ms. Zamora worked between 40 and 50 hours per week. Exhibit 16 at 11-15.

Although not recounted in Ms. Zamora's affidavit, the coronavirus pandemic was severely affecting this country by February or March 2020. Ms. Zamora avers that on "March 18, 2020 I decided to not go to work. I took refuge in my house and only woke up to do the necessary things." Exhibit 1 ¶ 4. This account is corroborated in her employer's pay records. Exhibit 16 at 8 (showing that for the week beginning March 15, 2020, she worked 0.00 hours). Ms. Zamora attested about the next steps with respect to her employment: "In April 2020, I applied for unemployment online. I argued that my work was a place with many risks of contagion, since we were too many people working very closely. They denied me unemployment and said that I had just quit my job." Id. ¶ 5. The employment records do not say anything about whether Ms. Zamora quit her job, whether she sought unemployment benefits, or whether she was sick. See Exhibit 16.

Ms. Zamora did not see any medical doctors during this time. In her affidavit, she explained that "I believed in the diagnosis of the doctor who said it was stress so I never thought it could be a disability." Id.

Ms. Zamora returned to work in May 2020. Exhibit 1 ¶ 6. (Apparently, Ms. Zamora changed employers because the employment records she filed do not contain any information about her returning to work at the company where she worked before the pandemic. See Exhibit 16.) She stated: "My headaches increased.… I only worked until June 6, because my headaches were getting more and more intense, my legs and arms had no energy, my tongue did not have the normal movement. I could talk but I had difficulty moving it and my fingers were numb." Id. Records from the California Unemployment Office confirm that she applied for benefits in June 2020. Exhibit 15 at 2.[4] Ms. Zamora received benefits for about one year. Id. at 3.

[4] The completeness of the unemployment records is uncertain as these records do not reflect an application for benefits in April 2020.

Approximately eight months after the flu vaccination, Ms. Zamora had a telemedicine appointment with a physician assistant at Salud Para La Gente, Alicia Potes. Exhibit 4 at 117. Ms. Zamora reported three weeks of bilateral hand cramping. She also complained about "some issues going back to the fall, Oct. 2019. She says her symptoms started after getting the flu vaccine. She was feeling confused and having headaches." Id. On exam, Ms. Zamora had normal cognitive function, but she had a depressed mood and flat affect. Id. at 118. PA Potes assessed Ms. Zamora has having a headache syndrome, depression and pain and she suspected that Ms. Zamora's "occurred symptoms are related to depression." PA Potes referred Ms. Zamora to neurology. Id. at 119.

Over the next three months, Ms. Zamora sought a variety of medical providers for a variety of complaints. However, these details do not affect whether Ms. Zamora has established whether the flu vaccine caused her to suffer chronic fatigue syndrome.

A more relevant record was created on September 26, 2020. On that date, a physician assistant (Caitlin Casey) diagnosed Ms. Zamora as suffering from chronic fatigue syndrome. Exhibit 4 at 141. Ms. Casey supported Ms. Zamora's request for disability benefits with an opinion regarding chronic fatigue syndrome. Exhibit 15 at 4. Ms. Zamora's expert, Dr. Miglis, agreed with the diagnosis of chronic fatigue syndrome. Exhibit 19 at 12. So, too, the Secretary's expert, Dr. Staud, agreed that Ms. Zamora suffered from chronic fatigue syndrome. Exhibit A at 12. However, as discussed below in section V.A.2, Dr. Staud places the onset of Ms. Zamora's chronic fatigue syndrome before (not after) her flu vaccination.

*Chronic Fatigue Syndrome*

Chronic fatigue syndrome is "a serious, chronic, complex, and systemic disease that frequently and dramatically limits the activities of affected patients." Institute of Medicine Report at 5 */ pdf 28*.[5] Sometimes, "chronic fatigue syndrome" is joined with another condition, known as "myalgic encephalomyelitis," which is often abbreviated "ME." Id. at 27-28. */ pdf 50.* For the sake of simplicity and consistent with the parties' terminology, this decision labels Ms. Zamora's condition as "chronic fatigue syndrome." People with "chronic fatigue syndrome" have three symptoms: (1) a substantial reduction in the ability to engage in activities, which is accompanied by fatigue, (2) post-exertional malaise, and (3) unrefreshing sleep. Id. at 6 */pdf 29*. They also have either cognitive impairment or orthostatic intolerance. Id.

Doctors have limited knowledge about what causes chronic fatigue syndrome. Dr. Staud stated that "The disease has an 'unknown etiology.'" Exhibit A at 9. Dr. Miglis did not profess to have any more knowledge. He wrote: "The cause of ME/CFS remains unknown, however multiple lines of evidence have demonstrated impairment in energy metabolism pathways, autonomic nervous system function, immune dysfunction, and neuro-inflammation." Exhibit 19 at 3.

Dr. Miglis presented various articles that found unusual immunologic results in people with chronic fatigue syndrome. Immunologic substances studied included: antibodies to EBNA

[5] Institute of Medicine, Beyond Myalgic Encephalomyelitis / Chronic Fatigue Syndrome (2015); filed as Exhibit 21.

(Loebel),[6] low amounts of natural killer cells (Strayer),[7] autoantibodies to nuclear envelope antigens (Konstantinov),[8] various cytokines (Montoya),[9] and autoantibodies to muscarinic cholinergic receptors (Tanaka, Chu).[10] Other articles have noted that some infections precede the onset of chronic fatigue syndrome. See Bateman,[11] White,[12] and Magnus.[13]

However, Ms. Zamora is not argued to have suffered from an infection before she developed chronic fatigue syndrome. Her medical records on this point are relatively muted.

After Ms. Zamora was diagnosed with chronic fatigue syndrome, she received medical treatment from many doctors. But, these more recent medical records do not help determine whether a flu vaccine can cause chronic fatigue syndrome. For more information about the course of Ms. Zamora's health, see Pet'r's Br. at 12-26; Resp't's Br. at 10-17 and the medical records cited therein.

---

[6] Madlen Loebel et al., Serological profiling of the EBV immune response in Chronic Fatigue Syndrome using a peptide microarray, 12 PLoS ONE 1 (2017); filed as Exhibit 26.

[7] David the Secretary. Strayer, Low NK Cell Activity in Chronic Fatigue Syndrome (CFS) and Relationship to Symptom Severity, 6 J. CLIN. & CELLULAR IMMUNOL. 4 (2015); filed as Exhibit 28.

[8] K. Konstantinov et al., Autoantibodies to nuclear envelope antigens in chronic fatigue syndrome, 98 J. CLIN. INVEST. 1888 (1996); filed as Exhibit 31.

[9] Jose G. Montoya et al., Cytokine signature associated with disease severity in chronic fatigue syndrome patients, 114 PROC. NATL. ACAD. SCI. USA E7150 (2017); filed as Exhibit 34.

[10] Susumu Tanaka et al., Autoantibodies against muscarinic cholinergic receptor in chronic fatigue syndrome, 12 INT. J. MOL. MED. 225 (2003); filed as Exhibit 32.
Lily Chu et al., Onset Patterns and Course of Myalgic Encephalomyelitis/Chronic Fatigue Syndrome, 7 FRONT. PEDIATR. 1 (2019); filed as Exhibit 39.

[11] Lucinda Bateman et al., Myalgic Encephalomyelitis/Chronic Fatigue Syndrome: Essentials of Diagnosis and Management, 96 MAYO CLIN. PROC. 2861 (2021); filed as Exhibit 22.

[12] D. White et al., Incidence, risk and prognosis of acute and chronic fatigue syndromes and psychiatric disorders after glandular fever, 173 BR. J. PSYCHIATRY 475 (1998); filed as Exhibit 23.

[13] Magnus et al., Chronic fatigue syndrome/myalgic encephalomyelitis (CFS/ME) is associated with pandemic influenza infection, but not with an adjuvanted pandemic influenza vaccine, 33 VACCINE 6173 (2015); filed as Exhibit 27.

## II. Procedural History

### A. Proceedings at the Office of Special Masters[14]

Ms. Zamora first consulted Attorney Andrew Downing, who frequently represented petitioners in the Vaccine Program, at the law firm Van Cott & Talamante, PLLC, on October 7, 2020.[15] Paralegals gathered medical records.

Ms. Zamora started her claim by filing a petition on June 1, 2021. She was represented by Attorney Downing, still at Van Cott & Talamante.

The Secretary reviewed this material and advised that Ms. Zamora was not entitled to compensation. The Secretary proposed that Ms. Zamora's chronic fatigue syndrome developed before the vaccination. Resp't's Rep., filed May 6, 2022, at 18. Because the parties appeared to be seeking reports from experts, a set of instructions for experts was issued. See Order, issued Aug. 9, 2022.

Around this time, Mr. Downing switched law firms, starting a law firm known as Downing, Allison & Jorgenson. See Pet'r's Mot. for Interim Fees, filed Jan. 5, 2025, at 31.

Ms. Zamora supported her claim with a first report from Dr. Miglis. Exhibit 19, filed Feb. 6, 2023. Dr. Miglis recounted Ms. Zamora's medical records. Id. at 5-11. He stated that she suffered from chronic fatigue syndrome. Id. at 12. The onset of this problem was "as early as October 2019, and as late as December 2019." Id.

Dr. Miglis provided background information about chronic fatigue syndrome. Id. at 2-5. As to how a flu vaccine can cause chronic fatigue syndrome, he wrote: "The mechanism of influenza vaccine-induced ME/CFS has not been described. However, given that ME/CFS has been described after influenza infection, a presumed theory is one of molecular mimicry."

In turn, the Secretary opposed Ms. Zamora's claim by presenting a first report from Dr. Staud. Exhibit A, filed June 6, 2023. Among the opinions that Dr. Staud presented was a view that Ms. Zamora developed chronic fatigue syndrome before the vaccination. Id. at 12. Dr. Staud also challenged the assertion that a flu vaccine can cause chronic fatigue syndrome.

Ms. Zamora attempted to address Dr. Staud's opinion by filing a second report from Dr. Miglis. Exhibit 38, filed Aug. 15, 2023. Dr. Miglis essentially maintained the opinions that he

---

[14] The early procedural history is largely taken from the Entitlement Decision, 2025 WL 1105282.

[15] Activities of attorneys and other professionals associated with Mr. Downing are found in Exhibit A to Pet'r's Mot. for Interim Fees, filed Jan. 5, 2025. The work performed at Van Cott & Talamante begin on page 42.

had expressed previously. For example, Dr. Miglis continued to assert that Ms. Zamora's chronic fatigue syndrome started after (not before) her vaccination. Id. at 1.

With the disclosure of opinions from experts completed, the parties were directed to file briefs. Order, issued April 4, 2024. As part of this process, Ms. Zamora was asked whether she wanted to pursue a claim that the vaccination significantly aggravated (as opposed to caused) her chronic fatigue syndrome. Via an affidavit, Ms. Zamora confirmed that she was pursuing an initial onset claim only. Exhibit 48.

As instructed, the parties advocated through memoranda. Ms. Zamora filed her initial brief on June 19, 2024, and her reply on September 17, 2024. In between, the Secretary filed his brief on August 19, 2024.

After the briefing ended, Mr. Downing stopped representing Ms. Zamora. He was replaced as counsel of record by Attorney Courtney Jorgenson, who works at the law firm, Siri & Glimstad, LLP. Attorney Jorgenson formerly was a partner of Mr. Downing.

Ms. Zamora was found not entitled to compensation. 2025 WL 1105282. The primary reason was that Ms. Zamora failed to present a persuasive theory to explain how the vaccine can cause chronic fatigue syndrome, which corresponds to the first prong in Althen v. Sec'y of Health & Hum. Servs., 418 F.3d 1274 (Fed. Cir. 2005). The Entitlement Decision also found that Ms. Zamora did not prevail on the timing (or third) prong of Althen in that Ms. Zamora manifested symptoms of chronic fatigue syndrome before the vaccination. The Entitlement Decision did not reach the second prong of Althen.

### B. Motion for Review

Ms. Zamora contested the outcome of the Entitlement Decision by filing a motion for review. Attorney Jorgenson drafted the motion for review. The motion for review challenged the resolution of both the first and third prongs of Althen.

The Secretary responded. The Secretary defended the outcome of the Entitlement Decision.

The Court denied the motion for review in an opinion that was essentially six single-spaced pages. As discussed below, the Court rejected Ms. Zamora's arguments using relatively strong language. The Court concluded: "Litigants are reminded that appeals are not generally for lifting the curtain on a closed record." Opinion & Order, 178 Fed. Cl. 284, 290 (2025).

### C. Attorneys' Fees and Costs

Ms. Zamora requests reasonable attorneys' fees and costs through a motion filed on June 25, 2026. For the work her attorneys and other professionals at Siri performed, Ms. Zamora requests $15,558.72. Based upon a January 5, 2025 motion for interim fees, Ms. Zamora requests $89,491.47 for work Mr. Downing and other professional performed at the earlier law firms.

The Secretary opposes an award of attorneys' fees and costs for activities associated with the motion for review. The Secretary argues "petitioner's motion for review could not feasibly result in reversal, as it amounted to an improper invitation to the [Court of Federal Claims] to reweigh the Special Master's weighing of the evidence." Resp't's Resp., filed July 7, 2025, at 6.

Ms. Zamora argued that her motion for review should be compensated. Pet'r's Reply, filed Aug. 28, 2025. As discussed below, her argument was very limited.

The Secretary clarified the scope of his opposition. Resp't's Resp., filed Sep. 18, 2025. Ms. Zamora did not submit another substantive brief. Pet'r's Status Rep., filed Nov. 3, 2025. However, Ms. Zamora requested additional attorneys' fees. Pet'r's Supp'l Mot., filed Nov. 4, 2025. With that submission, the issues are ready for adjudication.

## III. Analysis Part One: Eligibility for An Award of Attorneys' Fees and Costs

Petitioners who have not been awarded compensation (like Ms. Zamora here) are eligible for an award of attorneys' fees and costs when "the petition was brought in good faith and there was a reasonable basis for the claim." 42 U.S.C. § 300aa-15(e)(1). As the Federal Circuit has stated, "good faith" and "reasonable basis" are two separate elements that must be met for a petitioner to be eligible for attorneys' fees and costs. Simmons v. Sec'y of Health & Hum. Servs., 875 F.3d 632, 635 (Fed. Cir. 2017).

Here, for the litigation before the Office of Special Masters, a sufficient quality and quantum of evidence supported Ms. Zamora's claim that she satisfied the reasonable basis standard. This evidence primarily consists of the reports from Dr. Miglis. The Secretary has not challenged reasonable basis for activities at the Office of Special Masters. Moreover, the litigation at the Office of Special Masters was not unusual that would warrant denying attorneys' fees and costs as a matter of discretion.

## IV. Analysis Part Two: Reasonable Attorneys' Fees and Costs for Ms. Zamora's Two Initial Law Firms[16]

### A. Standards for Adjudication for Attorneys' Fees

Under the Vaccine Act, a special master may award reasonable attorneys' fees and costs. 42 U.S.C. § 300aa-15(e)(1). Reasonable attorneys' fees are calculated by multiplying a reasonable hourly rate by a reasonable number of hours expended on litigation, the lodestar approach. Avera, 515 F.3d at 1347–48 (quoting Blum v. Stenson, 465 U.S. 886, 888 (1984)); Saxton v. Sec'y of Health & Human Servs., 3 F.3d 1517, 1521 (Fed. Cir. 1993). In light of the Secretary's lack of objection, the undersigned has reviewed the fee application for its reasonableness. See McIntosh v. Sec'y of Health & Human Servs., 139 Fed. Cl. 238 (2018).

[16] By coincidence, Mr. Downing's work essentially coincided with litigation at the Office of Special Masters. Attorney Jorgenson's work at Siri began after the Entitlement Decision was issued. Thus, dividing the analysis by law firm functions as a proxy for dividing for the entitlement decision from the motion for review.

Special masters have "wide latitude in determining the reasonableness of both attorneys' fees and costs." Hines v. Sec'y of Health & Human Servs., 22 Cl. Ct. 750, 753 (1991). They may look to their experience and judgement to reduce the number of hours billed to a level they find reasonable for the work performed. Saxton ex rel. v. Sec'y of Health & Human Servs., 3 F.3d 1517, 1521 (Fed. Cir. 1993).

Petitioners "bear[] the burden of establishing the hours expended, the rates charged, and the expenses incurred." Wasson v. Sec'y of Health & Human Servs., 24 Cl.Ct. 482, 484 (1991), aff'd in relevant part, 988 F.2d 131 (Fed. Cir. 1993). Adequate proof of the claimed fees and costs should be presented when the motion is filed. Id. at 484 n.1. Counsel "should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." Hensley v. Eckerhart, 461 U.S. 424, 434 (1983).

**B. Activities of Professionals at Van Cott & Talamante, PLLC**

For this phase, Ms. Zamora requests $16,649.50 in attorneys' fees. Mr. Downing and other professionals have billed at various hourly rates that are generally reasonable.

While most charges are reasonable, some are not. A discussion of the excessive charges follows:

1. Attorney Reviewing Medical Records

When an attorney does the work of a paralegal or administrative assistant, he or she should be paid a rate commensurate with the nature of the work. See Valdes v. Sec'y of Health & Human Servs., 89 Fed. Cl. 415, 425 (2009) (noting that "the Special Master exercised appropriate discretion in denying requested costs for work performed by Petitioner's counsel's associate" when the special master determined "that the associate's time spent obtaining medical records was more consistent with paralegal duties."). One example of a task that paralegals competently perform is summarizing medical records. See Broussard v. Sec'y of Health & Human Servs., No. 18-302V, 2025 WL 2733619, at *3 (Fed. Cl. Spec. Mstr. Sep. 3, 2025) (noting the law firm's paralegals reviewed medical records); see also Fields for Estate of Lawrence v. Sec'y of Health & Hum. Servs., No. 17-1056V, 2022 WL 3569300, at *4 (Fed. Cl. Spec. Mstr. July 27, 2022) (reducing attorney's fees by approximately $17,000 because an attorney, not a paralegal, summarized medical records), mot. for rev. denied, 2022 WL 4100173 (Fed. Cl. Aug. 23, 2022).

Here, Ms. Jorgenson occasionally took the lead in reviewing medical records. See, e.g., entries for April 7, 2021 through May 31, 2021. Mr. Downing also reviewed medical records without the benefit of a paralegal's initial assistance. See, e.g., entries from Nov. 16, 2020 through Nov. 27, 2020. A more reasonable (or less expensive) way would be for a paralegal to summarize them before the attorney. Thus, $3,000.00 is deducted.

2. Mistaken Entry

The entry for May 26, 2021 is for a post-hearing statement. Ms. Zamora's case had not reached a hearing. Thus, the charge ($385.00) is eliminated.

3. Clerical

Under various fee-shifting regimes, attorneys may charge for tasks performed by paralegals. The justification is that the paralegal is stepping in for an attorney and charging a lower hourly rate for work an attorney would otherwise perform. However, attorneys may not charge for clerical tasks because the attorney's hourly rate reflects overhead expenses, such as employing a secretary. Missouri v. Jenkins, 491 U.S. 274, 288 n.10 (1989); Bennett v. Dep't of Navy, 699 F.2d 1140, 1145 n.5 (Fed. Cir. 1983); Guy v. Sec'y of Health & Human Servs., 38 Fed. Cl. 403, 407-08 (1997).

Here, paralegals often charged for activities that are properly categorized as clerical, such as receiving ECF notifications and filing documents. See, e.g., entries for April 24, 2021 through June 11, 2021; February 21, 2022 through February 24, 2022; March 17, 2022.

Paralegals often invoiced 0.40 hours for the routine task of requesting medical records. See, e.g., entries for Nov. 12, 2020. In the undersigned's experience, this task usually takes about 10 minutes (or 0.2 hours). To account for these issues, $800.00 is deducted.

4. Costs

Van Cott & Talamante incurred reasonable costs in the amount of $424.44. There is no reduction.

5. Summary

| | |
|---|---|
| Van Cott & Talamante Original Fees Request | $16,649.50 |
| Reduction for Attorneys Charging for Paralegal Work | $3,000.00 |
| Reduction for Erroneous Entry | $385.00 |
| Reduction for Excessive and/or Clerical Activities | $800.00 |
| Subtotal for Fees | $12,464.50 |
| Costs | 424.44 |
| Total for Van Cott & Talamante | $12,888.94 |

**C. Activities of Professionals at Downing, Allison & Jorgenson**

Ms. Zamora requests $59,780.50 in attorneys' fees for this phase. Mr. Downing and other professionals have billed at various hourly rates that are generally reasonable.

While most charges are reasonable, some are not. A discussion of the excessive charges follows:

1. Vague Entries

To facilitate the process of evaluating the reasonableness of an attorney's activities, in November 2004, the Office of Special Masters issued revised Guidelines for attorneys. The Guidelines state "counsel are advised to maintain detailed contemporaneous records of time and funds expended under the Program." Office of Special Masters, Guidelines for Practice under the National Vaccine Injury Compensation Program (Rev. Nov. 2004) at § XIV.

Here, many activities are described vaguely. One recurring example concerns communications with the client. One example is the entry for July 7, 2022 ("Review email from client with questions regarding case; correspondence to in response"). Another example is from October 17, 2022 ("Correspondence with Alejandro Torres regarding case"). Without some information about the nature of these communications, assessing the reasonableness of the associated charges is difficult.

The fact that these activities are for client communications does not matter. "[A]dequately identif[ing] the purpose of the activities" does "not in most cases invade the attorney-client privilege when applied to client communications." Avgoustis v. Shinseki, 639 F.3d 1340, 1344-45 (Fed. Cir. 2011). The January 4, 2022 order regarding attorneys' fees pointed out this issue. To account for these vague entries, $500.00 is deducted.

2. Attorney Reviewing Medical Records

As discussed above, attorneys should not charge attorney rates when they are the primary person reviewing medical records. In the context of the second law firm, Ms. Jorgenson occasionally took the lead in reviewing medical records. See, e.g., entries for July 15, 2022; August 15, 2022. A more reasonable (or less expensive) way would be for a paralegal to summarize them before the attorney. Thus, $800.00 is deducted.

3. Clerical Activities

As noted above, clerical activities should not be charged. At Mr. Downing's law firm, paralegals often charged for activities that are properly categorized as clerical, such as receiving ECF notifications and filing documents. See, e.g., entries for July 16, 2022; July 19, 2022; Aug. 6, 2022; Oct. 25, 2022; June 7, 2023; April 24, 2022. To account for this, $3,000.00 is deducted.

4. Excessive Charges

Paralegals often invoiced 0.40 hours for the routine task of requesting medical records. See, e.g., entry for April 15, 2024. In the undersigned's experience, this task usually takes about 10 minutes (or 0.2 hours). Similarly, there are a handful of duplicate entries. See, e.g., Aug. 18, 2022; May 19, 2022; Aug. 21, 2023. To account for these excessive charges, $600.00 is deducted.

5. Attorneys' Costs

For her attorneys' costs, Ms. Zamora requests $12,637.03. Several small items derive from obtaining medical records and postage. These items are reasonable and awarded.

The bulk ($12,500.00) comes from the work of Dr. Miglis. For his first report, Dr. Miglis has charged 17 hours at a rate of $500.00 per hour. Pet'r's Mot. for Interim Fees, Exhibit A at 25. For his second report, Dr. Miglis has charged 8 hours at a rate of $500.00 per hour. Id. at 30.

The amount requested is reasonable. However, Dr. Miglis is encouraged to describe his activities with more specificity. For example, rather than simply writing "review of literature," Dr. Miglis could identify what article is being reviewed. Failure to provide this specificity may result in a deduction.

6. Summary

| | |
|---|---|
| Amount Originally Requested in Fees | $59,780.50 |
| Reduction for Vague Entries | $500.00 |
| Reduction for Attorneys Charging for Paralegal Work | $800.00 |
| Reduction for Clerical Work | $3,000.00 |
| Reduction for Excessive Charges | $600.00 |
| Subtotal for Attorneys Fees | $54,880.50 |
| Costs | $12,637.03 |
| Total | $67,517.53 |

### D. Summary for Law Firms at which Mr. Downing Worked

| | |
|---|---|
| Van Cott & Talamante Fees and Costs | $12,888.94 |
| Downing, Allison & Jorgenson Fees and Costs | $67,517.53 |
| Total | $80,406.47 |

## V. Analysis Part Three: Reasonable Attorneys' Fees and Costs for Ms. Zamora's Third Law Firm

Attorney Jorgenson's work at Siri can be divided into two periods: (A) the motion for review and (B) other miscellaneous work.

### A. Motion for Review

As previously stated, by the time the Entitlement Decision issued, Mr. Downing had stopped representing petitioners in the Vaccine Program and Ms. Jorgenson had begun working at Siri. Thus, nearly all of the time for the $15,447.00 charged by Siri for fees flows from work on the motion for review, which the Secretary has challenged.[17]

[17] The motion also purports to seek $111.72 in costs based upon Exhibit 60. However, Exhibit 60 consists of six pages of PACER receipts, totaling less than $5.00. This is a de minimis cost for which attorneys should not charge their clients.

The standards for assessing whether reasonable basis supports a motion for review or appeal to the Federal Circuit are not entirely clear. Recent Federal Circuit precedents regarding reasonable basis have addressed whether a claim was supported by reasonable basis before a special master. Thus, these Federal Circuit cases have looked to the evidence before the special master. See, e.g., Cottingham v. Sec'y of Health & Hum. Servs., 971 F.3d 1337, 1356 (Fed. Cir. 2020). Whether the same "scintilla" of the evidence should be the standard by which motions for review or appeals should be measured has not been decided by the Federal Circuit.

The Secretary maintains that the motion for review that the time associated with the motion for review should not be compensated. The Secretary argues: "petitioner pointed to no evidence that the Special Master ostensibly failed to address, nor did petitioner identify any factual finding that was putatively unsupported or unexplained." Resp't's Resp. at 6. Quoting Johnson v. Sec'y of Health & Hum. Servs., No. 90-645V, 1992 WL 247565, at *2 (Cl. Ct. Spec. Mstr. Sep. 14, 1992), The Secretary characterizes the motion for review as a "basically hopeless appeal." Id. at 7.

Ms. Zamora's response is relatively short. In terms of addressing the potential "hopelessness" of the motion of review, Ms. Zamora's argument is contained in one paragraph:

> In her Memorandum of Objections, Petitioner explained that Dr. Miglis, as well as multiple treating physicians, acknowledge the challenges of determining the precise etiology of CFS. Petitioner's Memorandum of Objections in Support of Motion for Review, p. 8. Additionally, Petitioner's Memorandum of Objections discusses that Dr. Miglis cites to medical literature discussing various immune alterations in CFS patients, and specifically, the mechanism of immune dysregulation and autoimmunity involved in the pathogenesis of CFS. Id. at 10. Considering the strength of the expert testimony and medical literature supporting her case, as well as the opinions of her treating physicians, Petitioner raised concerns in a Memorandum of Objections that the Special Master has required Petitioner to demonstrate a level of scientific certainty that does not yet exist.

Pet'r's Reply at 3.

Although Ms. Zamora's summary of her motion for review and memorandum of objections is accurate, it does not engage with The Secretary's argument. At best, Ms. Zamora contends that the underlying entitlement decision required a "level of scientific certainty."

But, any argument that the entitlement decision imposed too high a burden is addressed by the Court's May 28, 2025 Opinion & Order. "Special Master Moran correctly held: a 'special master may properly require some empirical evidence to show that a particular vaccine can cause a particular disease.' [Entitlement Decision] at 13. In no way is that standard one of heightened scientific certainty. It is hornbook vaccine causation analysis." Opinion and Order, 178 Fed. Cl. at 289. To support the statement regarding "hornbook vaccine causation analysis," the Court relied upon Grant v. Sec'y of Health & Hum. Servs., 956 F.2d 1144, 1148 (Fed. Cir. 1992).

Moreover, the August 28, 2025 Reply does not say anything regarding the portion of the Entitlement Decision's determination that Ms. Zamora failed to meet the third (or timing) prong of Althen. In this context, the Court's Opinion & Order stated: "Both petitioner and respondent's experts *agree* that 'Ms. Zamora began suffering chronic fatigue syndrome months' prior to her influenza vaccination." Opinion & Order, 178 Fed. Cl. at 289 (emphasis in original). Thus, the motion for review to challenge prong 3 seems basically "hopeless." When a factual finding is consistent with the opinion of the petitioner's expert, it is extremely difficult (if not impossible) to understand how the petitioner would prevail on this point. The extreme unlikelihood of success with respect to prong 3 undermines the entire motion for review because Ms. Zamora could prevail upon the motion for review only if she established an error for both Althen prong one and Althen prong three. See W.C. v. Sec'y of Health & Hum. Servs., 704 F.3d 1352, 1358 (Fed. Cir. 2013) ("a petitioner must establish all three prongs of the Althen test"); Walters v. Sec'y of Health & Hum. Servs., No. 15-1380V, 2023 WL 5274006, *10 (Fed. Cl. Aug. 16, 2023) (stating that even if the special master had erred on prong 3, any error would not affect the result because the special master's finding on prong 1 was not arbitrary), aff'd, No. 2023-2369, 2025 WL 1000404 (Fed. Cir. Apr. 3, 2025). Again, it seems telling that when called upon to justify the reasonableness of filing a motion for review, Ms. Zamora did not say anything about her prong three argument.

Thus, Ms. Zamora's case presents a rare circumstance in which attorneys' fees and costs associated with the motion for review can be denied as a matter of discretion. See James Cornelius v. Sec'y of Health and Hum. Servs., 984 F.3d 1374, 1379 (Fed. Cir. 2021) (noting that even if a petitioner were found to possess a reasonable basis for her claim (at any point), a special master retains the discretion to deny attorneys' fees and costs).

When litigation is not likely to produce a favorable result, attorneys should not continue the litigation. While motions for review are permitted, the legislative history of the Vaccine Act indicates that appeals should be rare. "The conference agreement provides for an appeal of the master's decision to the U.S. Claims Court under very limited circumstances.... The Conferees have provided for a limited standard for appeal from the master's decision and do not intend that this procedure be used frequently but rather in those cases in which a truly arbitrary decision has been made." H.R.Rep. No. 101–386, at 516–17 (1989) (Conf.Rep.), reprinted in 1989 U.S.C.C.A.N. 3018, 312. Admittedly, petitioners in the Vaccine Program have rarely been denied attorneys' fees for appeals. For some examples, see R.K. v. Sec'y of Health & Hum. Servs., 760 Fed. App'x 1010 (Fed. Cir. 2019) (affirming the denial of attorneys' fees incurred on a Federal Circuit appeal of a judgment denying entitlement); Mead v. Sec'y of Health & Hum. Servs., No. 19-667V, 2024 WL 4040000, at *5 n.13 (Fed. Cl. Sep. 4, 2024); Fields for Estate of Lawrence v. Sec'y of Health & Hum. Servs., No. 17-1056V, 2022 WL 4100173, at *2 n.6 (Fed. Cl. Sep. 7, 2022) (denying the fees and costs associated with a second motion for review); Phillips v. Sec'y of Health & Human Servs., 988 F.2d 111, 113 (Fed.Cir.1993) (Plager, J., concurring) (stating "the appropriateness of an award of fees related to the initial proceedings before the special master is an issue quite separate from the appropriateness of fees attributable to an appeal to this court.").

Outside of the Vaccine Program, appellate authorities have recognized that unusually weak arguments and evidence warrant exceptional judicial actions regarding attorneys' fees. See, e.g., AdjustaCam, LLC v. Newegg, Inc., 861 F.3d 1353 (Fed. Cir. 2017) (ruling district court

abused its discretion in refraining from finding the case exceptional after the patent holder's infringement arguments became baseless after a Markman hearing); Inventor Holdings, LLC v. Bed Bath & Beyond, Inc., 876 F.3d 1372 (Fed. Cir. 2017) (affirming award of attorneys' fees because patent holder should have known its business method patents were not viable); Minks v. Polaris Indus., Inc., 546 F.3d 1364, 1375 (Fed. Cir. 2008) (affirming deduction of fees where "the district court criticized [Plaintiff's] damages theory as 'economic nonsense' and only awarded half the reasonable fee to offset the 'great deal of time during trial [that] was wasted by Plaintiff attempting to evade the basic laws of economics and common sense").

The denial of attorneys' fees for the motion for review rests upon the circumstances in this case, including Ms. Zamora's presentation of two arguments that involved the weighing of evidence for which the standard of appellate review is high. See Opinion & Order, 178 Fed. Cl. at 288 (reciting standards of review). In addition, when called upon to defend the motion for review, Ms. Zamora presented extremely weak arguments that did not substantiate the likelihood of prevailing on the motion for review.

From March 28, 2025 through June 10, 2025, Attorney Jorgenson spent 26.9 hours (worth $10,760.00) and a paralegal spent 2.7 hours (worth $526.50) on activities flowing from the motion for review.[18] For the reasons explained above, $11,286.50 is deducted.

### B. Other Activities

While the motion for review is the main activity that was performed when Ms. Jorgenson was working at Siri, she and other professionals did other things as well. For example, before starting the motion for review, paralegals brought the case over to the new firm. Attorney Jorgenson also, reasonably, spent time reviewing the Entitlement Decision. Then, after the Court's Opinion & Order, Attorney Jorgenson and paralegals spent time closing out the case and preparing the motion for attorneys' fees. This time is reasonable.

On the other hand, petitioner's August 28, 2025 Reply was wholly ineffective in addressing the Secretary's objection to the motion for review. Thus, the November 4, 2025 motion for supplemental attorneys' fees is denied. It also should be noted that if Ms. Zamora had not filed a hopeless motion for review, then the Secretary would not have objected to the motion for review and, therefore, Ms. Zamora would not have been required to defend the motion for review.

### C. Summary

For work performed at Siri, a reasonable amount of attorneys' fees is $4,160.50.

---

[18] The amount of time spent on writing the motion for review was 24.5 hours (worth $9,800.00). Although this much time is generally reasonable, Attorney Jorgenson is encouraged to define her activities with more specificity. Several entries say only: "Continue drafting petitioner's memorandum of objections in support of motion for review." Attorney Jorgenson could add more detail. See entry for April 14, 2025 (repeating this language and adding "Review Tullio, Dennington, W.C., Caves").

| | |
|---|---|
| Amount Originally Requested in Attorneys' Fees | $15,447.00 |
| Reduction for Motion for Review | $11,286.50 |
| Total | $4,160.50 |

## VI. Conclusion

Ms. Zamora is awarded $84,566.97 in attorneys' fees and costs. The amount of $80,406.97 shall be paid through an ACH deposit to Mr. Downing's IOLTA account for prompt disbursement. The amount of $4,160.50 shall be paid through an ACH deposit to Ms. Jorgenson's IOLTA account for prompt disbursement.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court is directed to enter judgment herewith.[19]

**IT IS SO ORDERED**.

s/Christian J. Moran
Christian J. Moran
Special Master

[19] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by filing a joint notice renouncing their right to seek review.